IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| JOYCE BOGGUESS, o/b/o J.J.B.,<br>  Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br>  Defendant. | Case No. 4:19-cv-04159-JEH |

**Order**

Now before the Court is the Plaintiff Joyce Bogguess', o/b/o J.J.B., Motion for Summary Judgment (Doc. 10), the Commissioner's Motion for Summary Affirmance (Doc. 16), and the Plaintiff's Reply (Doc. 17).[1] For the reasons stated herein, the Court DENIES the Plaintiff's Motion for Summary Judgment and GRANTS the Commissioner's Motion for Summary Affirmance.[2]

**I**

In March 2016, Plaintiff Joyce Bogguess, on behalf of J.J.B., submitted an application for supplemental security income (SSI) childhood benefits, alleging J.J.B.'s disability began on March 1, 2012. The application was denied on May 16, 2016 and denied upon reconsideration on September 20, 2016. A written request for a hearing was granted, and the hearing was held on March 13, 2018 before the Honorable Robert V. Luetkenhaus (ALJ) via video. The claimant was represented by an attorney, and the claimant (J.J.B.) and her grandmother (Joyce) testified. At

---

[1] The parties consented to the jurisdiction of a U.S. Magistrate Judge. (Docs. 9, 12).
[2] References to the pages within the Administrative Record will be identified by AR [page number]. The Administrative Record appears at (Doc. 6) on the docket.

1

the hearing, J.J.B.'s alleged disability onset date was amended to the date her SSI application was filed, March 7, 2016. The ALJ issued an unfavorable Decision on August 14, 2018. The Appeals Council denied Joyce's request for review on June 13, 2019, making the ALJ's Decision the final decision of the Commissioner. Joyce filed the instant civil action seeking review of the ALJ's Decision on August 12, 2019.

## II

At the time Joyce applied for SSI childhood benefits on behalf of J.J.B., J.J.B. was seven years old. At the time of the hearing in March 2018, J.J.B. was nine years old and was in fourth grade. J.J.B. first testified. She said she did not talk to the other kids at school and agreed with the ALJ's observation that she was "kind of a quiet person." AR 49. She said she could not tie her own shoes and her grandmother helped her put clothes on. She could not count coins and her reading homework was "really hard." AR 50.

J.J.B.'s grandmother, Joyce, testified that J.J.B. was an "unhappy kid" who had mood swings and meltdowns, cried, and was a nervous person. AR 53-54. As for J.J.B.'s most recent report card, Joyce testified that J.J.B. was "improving a little bit, she just struggle [sic]." AR 54. She said J.J.B. was two to three grades behind and had trouble with everything. J.J.B. got along with "certain" kids at school. AR 56. She was in all special education classes. Her teachers reported to Joyce that J.J.B. needed to focus on reading and math. Joyce said she spoke with J.J.B.'s teachers all the time and would tell them if J.J.B. had problems sleeping because of her sleep disorder. Joyce stated the medicine J.J.B. took – Clonidine – helped J.J.B. sleep. Joyce confirmed that school officials really liked J.J.B.

Joyce explained J.J.B.'s extensive absences from school were due to her sleep disorder. If J.J.B. did not fall asleep and stay asleep long enough, Joyce would decide not to give her a full dose of her medication if she awakened too early (she

said a full dose at that time would cause J.J.B. to be tired). As a result, J.J.B. would stay up and then when it was time to get ready for school, she was tired. J.J.B. would be late to school because Joyce would let her sleep in when she became tired again after awakening too early. During the most recent school year, Joyce estimated J.J.B. missed ten days of school in three months.

### III

In his August 2018 Decision, the ALJ determined J.J.B. had the following severe impairments: learning disability; adjustment insomnia; obesity; and asthma. AR 16. In his consideration of whether J.J.B.'s individual impairments or combination of impairments met or medically equaled a listed impairment, the ALJ specifically identified Listings 103.03 (Asthma) and Listing 112.11 (Neurodevelopmental disorders). He determined Listing 103.3 was not met or equaled because the record showed no hospitalizations for asthma since the application date. He found there was no listing which specifically addressed adjustment insomnia, no potentially relevant listing such as any respiratory system listing would be met or medically equaled, and there was no listing specific to the evaluation of obesity impairments. The ALJ recognized that "[o]besity may have an adverse impact upon co-existing impairments." AR 17. He noted that no treating or examining medical source had specifically attributed additional or cumulative limitations to J.J.B.'s obesity. The ALJ determined, referring to his later more thorough explanation in the six functional equivalence domains, Listing 112.11 was not met or medically equaled where J.J.B. did not have the requisite extreme limitation of one, or marked limitation of two, of the four broad areas of mental functioning set out in the disability regulations for evaluating mental disorders. Rather, J.J.B. had only marked limitation in understanding, remembering, or applying information.

In his consideration of whether J.J.B.'s individual impairments or combination of impairments functionally equaled the severity of the listings, the ALJ initially clarified that he evaluated the "whole child" as provided in 20 C.F.R. § 416.926a(b) and (c) and as explained in SSR 09-1p. AR 17. He summarized J.J.B.'s hearing testimony as well as her grandmother Joyce's testimony, medical and school records dated between December 2015 and December 2017, J.J.B.'s teacher's March 2016 opinion, and the State Agency doctors' May and September 2016 opinions. A January 2016 medical record included reports that J.J.B. had sleep apnea and had problems with sleep, including that she woke up in the middle of the night. She was referred to a sleep specialist, and in March 2016 she saw Akshay K. Mahadevia, M.D. for a consultation. She alleged waking up, difficulty falling asleep, daytime sleepiness, and being irritable/tired. J.J.B. was prescribed clonazepam and referred for a sleep study.

At a follow up with Dr. Mahadevia in May 2016, J.J.B.'s sleep study showed a mild degree of occasional snoring but no evidence of obstructive sleep apnea. The clonazepam was not helpful and J.J.B. was more tired. Dr. Mahadevia advised she had adjustment insomnia and would outgrow it. Dr. Mahadevia prescribed Clonidine. In September 2016, clonazepam was not effective, but the Clonidine worked. Dr. Mahadevia advised J.J.B. take Clonidine before bed and one if she woke up in three to four hours. He also gave instructions on proper sleep hygiene, Joyce was advised to fill out a two-week sleep diary, and J.J.B. was referred for a psychologist evaluation. He also said that if there continued to be an issue, home tutoring would be considered. In December 2016, J.J.B. reported doing much better with Clonidine and because she was doing well, Dr. Mahadevia continued that medication. In November 2017, Dr. Mahadevia noted that J.J.B. was doing very well and felt the Clonidine was working well, and so the Clonidine was continued again.

January 2016 IEP paperwork completed by J.J.B.'s school provided that her intelligence testing showed IQ scores between 78 and 85, her grandmother did not report significant behavior or "social emotional" concerns, her grandmother reported she got along well with family members, and J.J.B. adjusted to changes in routine with ease. AR 19. A March 2016 school form noted J.J.B. was at the pre-kindergarten/kindergarten level in reading, math, and language, she was in special education classes due to a developmental delay and below average cognitive abilities. However, she had not repeated any grade, was a typical child, and her teacher stated that she "loved" J.J.B. *Id*. The school's April 2017 annual review of J.J.B.'s IEP provided she was a sweet and polite girl who was trying her best, and she was demonstrating progress in all core academic areas. She had positive relationships with peers and adults, her grandfather was extremely happy with her progress, she was currently in a much happier phase of her life, her relationships were more calm and stable, and she enjoyed classroom jobs. As for her grandmother's reports to the school that J.J.B.'s absence from school the first 39 days of the 2016-17 school year was due to her sleep disorder and pre-diabetic conditions, the school noted they did not have documentation of such in her health folder.

In a March 2016 Teacher Questionnaire, J.J.B.'s teacher noted that while J.J.B. was in second grade, her reading, math, and language were at a level of pre-kindergarten to first grade, she had daily obvious problems with attending and completing tasks, she had no problems interacting with others or caring for herself, and she was a happy and loved child. The ALJ generally gave the teacher's opinion "great weight" because it was consistent with J.J.B.'s IEP records, but she gave only "little weight" to the teacher's opinion that J.J.B. had obvious and daily difficulties with attending and completing tasks. AR 21. The State Agency doctors' opinions of "less than marked" limitations in three domains and "no" limitations in the

remaining three domains were given "great weight" with the exception of the domain of acquiring and using information. The ALJ found "marked" limitation in that domain. AR 22.

## IV

"The final determination of the Commissioner of Social Security after a hearing under [42 U.S.C. § 1383(c)(1)] shall be subject to judicial review as provided in section 405(g) of [Title 42] to the same extent as the Commissioner's final determinations under section 405 of [Title 42]." 42 U.S.C. § 1383(c)(3). Pursuant to 42 U.S.C. § 405(g), the Commissioner's findings must be sustained by the Court if they are supported by "substantial evidence." 42 USC § 405(g). The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971), *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

Under the Social Security Act, an individual under the age of 18 is considered disabled if he "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for

a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). There is a three-step process used to decide whether a child is disabled. *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 785 (7th Cir. 2003). First, the ALJ must determine whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 416.924(a). If not, the ALJ must next determine whether the claimant has a medically determinable impairment that is "severe" or combination of impairments that are "severe." *Id*. If the claimant does have an impairment or combination of impairments that are "severe," the ALJ next must finally determine whether the claimant has an impairment or combination of impairments that meets or medically equals the severity of a listing or that functionally equals the listing. *Id*.

A child's impairment meets a listed condition when it satisfies all the criteria of that listing and meets the duration requirement. 20 C.F.R. § 416.925(c)(3). An impairment is medically equivalent to a listed impairment if it is at least equal in severity and duration to the criteria of any listed impairment. 20 C.F.R. § 416.926(a). Medical equivalence is found where:

> (1) the child's impairment, though listed, is lacking one or more of the medical or severity criteria, but other findings related to the impairment are of at least equal medical significance to the listed criteria; (2) the child's impairment is not a listed condition but the impairment's medical and severity findings are of at least equal medical significance to a closely analogous listed condition; or (3) the child has a combination of impairments, no one of which equals a listed condition, but the impairments' medical and severity findings are of at least equal medical significance to a [closely analogous] listed condition.

*L.B.M. ex rel. Motley v. Astrue*, No. 18-cv-1354, 2010 WL 1190326, at *2 (S.D. Ind. Mar. 23, 2010) (citing 20 C.F.R. § 416.926(b)(1)-(3)).

To find that an impairment functionally equals a listing, the ALJ must assess the claimant's functioning in terms of six domains: 1) acquiring and using information; 2) attending and completing tasks; 3) interacting and relating with others; 4) moving about and manipulating objects; 5) caring for yourself; and 6) health and physical well being. 20 C.F.R. § 416.926a. To functionally equal the listings, the claimant's impairment or combination of impairments must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. *Id*.

### A

Joyce first argues that the ALJ erred in finding J.J.B.'s impairments did not meet or equal a listing. Specifically, Joyce faults the ALJ for not properly considering J.J.B.'s combined impairments under Listing 112.11, for failing to give any specific analysis of the requirements of Listing 112.11 (instead referring to his overall functional equivalency assessment), for failing to explain whether Listing 112.11 was the closest analogous Listing or how he determined that information, for failing to properly consider J.J.B.'s sleep disorder under the Listings, and for failing to call a medical advisor to render an opinion on medical equivalency. The Commissioner counters that Joyce's Listing 112.11 argument ignores the ALJ's explicit statement in his Decision which shows he considered that listing and whether J.J.B.'s impairments met or medically equaled its criteria. The Commissioner also argues that the ALJ gave great weight to the State Agency doctors' opinions, and they opined that J.J.B.'s impairments did not meet or medically equal any listing. The Commissioner says it was Joyce's burden to prove that the combined effects of J.J.B.'s impairments met a listing and, finally, the Commissioner argues the ALJ's consideration of J.J.B.'s insomnia was legally sufficient.

The ALJ did not commit reversible error in his Step Three consideration of whether J.J.B. had an impairment or combination of impairments that met or medically equaled the severity of a listing. With regard to Listing 112.11 (Neurodevelopmental disorders), the ALJ stated:

> As is more thoroughly explained in the six domains below, the claimant has the following degree of limitation in the four broad areas of mental functioning set out in the disability regulations for evaluating mental disorders in Listing 112.11: a marked limitation in understanding, remembering, or applying information, no limitation in interacting with others, a less than marked limitation in concentrating, persisting, or maintaining pace, and no limitation in adapting or managing oneself.

AR 17. As for J.J.B.'s marked limitation in understanding, remembering, or applying limitation, the ALJ later in his Decision articulated a "marked" finding was warranted where J.J.B. had significant delays in her academic achievement, including being two to three years behind her peers in reading, language, and math, and her teacher noted significant concerns in that area. As for J.J.B. experiencing no limitation in interacting with others, the ALJ pointed to J.J.B.'s medical and school records which indicated, among other things, that J.J.B. was described by her teacher her as kind, mature, and communicative, that J.J.B. sometimes socialized to the point of not finishing assignments due to her joy in social interactions, that she was capable of working with partners, that she was noted to respond well to constructive criticism and staff authority, and that she displayed a normal mood and affect. As for J.J.B.'s less than marked limitation in concentrating, persisting, or maintaining pace, the ALJ pointed out that treating doctors did *not* note inattentive or fidgety behavior, Joyce did not allege concerns with J.J.B.'s attention to school officials or doctors, J.J.B. had not been evaluated for any attentional disorder, and IEP records showed that she was attentive and remained on task until work was completed. As for J.J.B. experiencing no

limitation in adapting or managing herself, the ALJ rejected Joyce's allegations of J.J.B.'s significant difficulties with regard to personal care, extremely poor sleep, mood swings, and meltdowns because "none of these allegations are corroborated in the medical or school records." AR 26.

The Court has no difficulty tracing the path of the ALJ's reasoning from the evidence pertinent to Listing 112.11 and the ALJ's conclusions stated later in his Decision in the context of his functional equivalence analysis. *See Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995) (providing that an ALJ "must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning"). Indeed, the ALJ addressed the very evidence to which Joyce points in support of her Listings argument. He considered J.J.B.'s school attendance record, noting that she did not attend or register for school during the first 39 days of one school year and had several absences and many tardies. He considered the reports that J.J.B. was absent and/or tardy due to her sleep disorder. He noted J.J.B.'s objective tests which placed her two to three grade levels behind same age peers. The ALJ also considered that J.J.B. was in special education classes due to a developmental delay and below average cognitive abilities. The fact that the ALJ did not condense his analysis of the "meets or medically equals" Listing 112.11 question into one particular section of his Decision does not render the analysis deficient or otherwise lacking in specificity. *See Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) (unpublished opinion) (refusing to agree with the plaintiff that that ALJ's listings finding was unreasoned simply because the ALJ did not incorporate the information within a single paragraph as there "is no requirement of such tidy packaging" and the ALJ's decision is read as a whole and with common sense).

It is obvious to the Court that the ALJ considered J.J.B.'s combination of impairments where he reasoned:

> School records suggest that [J.J.B.'s] delays may be due to her poor attendance; it was noted that she missed the first 39 days of school, and then after starting school late, subsequently missed 11 days and had many tardies . . . However, records further note that her attendance was improving as the year went on [and] that she was making clear progress in all core academic areas[.]

AR 22. Later in the Decision, the ALJ reasoned:

> [D]espite her grandmother's claims of poor sleep, treating records show that after starting Clonodine, [J.J.B.] has consistently reported she was doing better . . . she was sleeping from 8 pm to 5 am; [sic] she was much more alert and awake and felt more attentive at school[.]

AR 27. The foregoing also does away with Joyce's argument that the ALJ did not properly consider J.J.B.'s sleep disorder under the Listings and, instead, reveals that Joyce simply believes that evidence of J.J.B.'s sleep disorder deserved more weight in favor of disability than it was given. She asserts a medical expert should have been called upon by the ALJ to render an opinion regarding medical equivalency, emphasizing that "[h]ow adjustment insomnia is considered under the Listings requires a medical opinion and should not be based on a hunch." Plf's MSJ (Doc. 10-1 at pg. 10).

But, notably, the State Agency doctors opined that J.J.B.'s impairments did not meet or medically equal the Listings and they specifically mentioned J.J.B.'s "adjustment insomnia" in their evaluations. *See* AR 72; AR 82. They identified Listings 112.05 (Intellectual disability) and 103.3 (Asthma) as the "Child Listings Considered." AR 71, AR 80. The ALJ considered those opinions and determined that with the exception of their opinions of less than marked limitations in acquiring and using information, their analyses "are well supported by citation to objective findings and consistent with the overall record[.]" AR 21. Thus, the ALJ's "meets or medically equals" analysis is supported by substantial evidence in the form of the State Agency doctors' opinions coupled with other evidence (identified

above). *See Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004) ("It is appropriate for an ALJ to rely on the opinions of physicians and psychologists who are also experts in social security disability evaluation"). The ALJ did not err by failing to obtain a medical expert's opinion on medical equivalence.

While it is true that the ALJ did not explain whether Listing 112.11 was the closest analogous listing for his impairments or how he determined it was such, the error is, at most, harmless. Joyce merely lodges that complaint but does not argue that a *different* listing was more closely analogous or that Listing 112.11 was in fact *not* the closest analogous listing. Even the State Agency doctors specifically identified only Listings 112.05 (Intellectual disability) and 103.3 (Asthma) and concluded that J.J.B.'s impairments or combination of impairments did not meet or medically equal the Listings. *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) (explaining that administrative error may be harmless and thus a court ought not remand a case to the ALJ where it is convinced that the ALJ would reach the same result).

**B**

Joyce also argues that in terms of the ALJ's functional equivalence analysis, the ALJ failed to properly consider the longitudinal evidence, preferring to focus on evidence that J.J.B. was improving. She takes issue with the ALJ's consideration of all but one (moving about and manipulating objects) of the six domains he was to consider. The Commissioner argues that Joyce's argument at the outset – that the ALJ did not comply with Social Security Ruling 09-1p[3] – is not persuasive where the ALJ's extensive analysis of each domain demonstrates that he

---

[3] SSR 09-1p provides that SSA "always evaluate[s] the 'whole child' when we make a finding regarding functional equivalence[.]" SSR 09-1p at *2.

considered the questions presented in SSR 09-1p[4] in light of the medical and school records as well as the testimony from J.J.B. and Joyce. Initially, the Court finds the ALJ did not err by failing to explicitly present in "Question – Answer" format the questions in SSR 09-1p. As Joyce acknowledges, adjudicators are not required to discuss all the considerations in SSR 09-1p in their decisions but rather are "only to provide sufficient detail so that any subsequent reviewers can understand how they made their findings." SSR 09-1p at *3. The Court can understand how the ALJ in this case made his findings.

With regard to Joyce's remaining arguments as to five of the six domains, the ALJ considered evidence both favorable to J.J.B.'s claim and evidence less so in his analysis of whether J.J.B. functionally equaled any of the Listings. The way in which Joyce presents her arguments as to each domain reveals that she expects the Court to reweigh the evidence in J.J.B.'s favor. Of course, the Court is precluded from doing so. *See Haynes v. Barnhart*, 416 F.3d 621, 627 (7th Cir. 2005) (explaining that in reviewing an ALJ's decision on appeal, the court is to review the record as a whole but is not to reweigh the evidence or substitute its own judgment for that of the ALJ).

The ALJ explained a "marked" limitation in the domain of acquiring and using information was warranted by evidence that J.J.B. was two to three years behind her peers in reading, language, and math, and her teacher's note of "significant concerns" in this area. The ALJ made obvious that the record did not

---

[4] SSR 09-1p sets forth the following questions SSA asks in evaluating the "whole child:"
    1.    How does the child function?
    2.    Which domains are involved in performing the activities?
    3.    Could the child's medically determinable impairment(s) account for limitations in the child's activities?
    4.    To what degree does the impairment(s) limit the child's ability to function age-appropriately in each domain?
*Id*. at *2-3.

support a greater limitation where school records suggested J.J.B.'s delays may be due to poor attendance given that when her attendance improved as a school year went on she "was making clear progress in all core academic areas" and her grandfather was "extremely happy" with her progress. AR 22. The ALJ also cited to school records which showed that J.J.B. was capable of following multi step procedures. Joyce originally argued in her opening brief that the ALJ erred when he determined J.J.B. had *less than marked* limitation, and in his brief, the Commissioner pointed out Joyce's error as the ALJ actually found "marked" limitation. In her Reply, Joyce tried to clarify her position, arguing "the ALJ should have at least found a marked limitation in this domain but evidence shows at least marked to extreme limitations." (Doc. 17 at pg. 2). The ALJ *did* find marked limitation and explained why the evidence did not support an "extreme" limitation finding. In other words, the ALJ built a logical bridge between the evidence and his conclusion as to the first domain. *Spicher v. Berryhill*, 898 F.3d 754, 757 (7th Cir. 2018) (stating "the ALJ must build an accurate and logical bridge from the evidence to [his] conclusion" and "an ALJ may not ignore evidence that undercuts [his] conclusion").

Joyce points out information contained within the record that indicated J.J.B. needed certain accommodations in school, that at times J.J.B. was two to four grades behind where she should have been, and that even with improvement J.J.B. was still far below her peers. First, of course, an ALJ is not required to mention every piece of record evidence. *Jeske v. Saul*, 955 F.3d 583, 593 (7th Cir. 2020). Second, as Joyce emphasizes, an ALJ must consider a child's limitations longitudinally. *See* SSR 09-1p at *9 ("As in any case, we must consider the effects of the impairment(s) longitudinally (that is, over time) when we evaluate the severity of the child's limitations"). That the ALJ omitted an explicit listing of the accommodations provided to J.J.B. at school, for instance, does not indicate he

14

failed to consider the effects of her impairments longitudinally. The Decision reveals quite the opposite; the ALJ considered that between January 2016 and April 2017 J.J.B. was continually assessed at grade levels below her actual age, nevertheless, she demonstrated progress in all core academic areas, was capable of following multi step procedures, and was attentive and remained on task until work was completed. The ALJ also observed a correlation between improved attendance at school and improvement in her performance at school. Third, while Joyce emphasizes evidence that J.J.B. was several grade levels behind where she should have been, the ALJ repeatedly pointed out that J.J.B. was "2-3 years behind in all academic areas[.]" *See* AR 20, AR 21, AR 22.

As for the ALJs' finding of "less than marked" limitation in the domain of attending and completing tasks, Joyce argues that the ALJ failed to acknowledge that a child cannot pay attention or focus if they are absent from school or asleep due to their sleep disorder. As discussed *supra*, the ALJ considered that treating records showed J.J.B. reported longer sleep and that she was more alert and awake and felt more attentive at school after starting a particular medication, and the ALJ observed a correlation between attendance at school and improvement in J.J.B.'s performance at school. The Court can trace the path of the ALJ's reasoning from that evidence, *no* treating doctors' notes of inattentive or fidgety behavior, *no* evaluation of J.J.B. for ADHD, *no* concerns about her attention alleged by her grandmother, and J.J.B.'s ability to remain on task until work was completed to the conclusion that J.J.B. had "less than marked" limitation in the second domain. *See Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (stating that an ALJ must "sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence . . . and to enable us to trace the path of the ALJ's reasoning").

As for the ALJs' finding of "no" limitation in the domain of interacting and relating with others, Joyce argues that the very record evidence to which the ALJ cited supports both J.J.B.'s and Joyce's testimony explaining J.J.B. had difficulty making friends and getting along with classmates. Thus, according to Joyce, the cited evidence indicates J.J.B.'s limitation interfered with her ability to independently initiate, sustain, or complete activities needed to interact and relate to others. The ALJ's stated reasons for his "no" limitation finding illustrate why Joyce's argument as to this domain are entirely unpersuasive. In assigning no limitation in this domain, the ALJ noted J.J.B. and Joyce's allegation that J.J.B. had significant difficulty getting along with others but continued, "*this is wholly inconsistent* with medical and school records, which does not support any limitation in this domain." AR 24 (emphasis added). The ALJ cited evidence that J.J.B.'s teacher described her as kind, mature, and communicative and that she loved J.J.B., and the teacher noted no problems with J.J.B.'s ability to interact with others. The ALJ did not shy away from evidence more favorable to J.J.B. as he cited IEP records which showed that J.J.B. initially had some problems with female peer relationships. The ALJ pointed out that as the year progressed, J.J.B. had positive, calm, and stable relationships with peers and adults, and she even socialized to the point of not finishing assignments due to her joy in social interactions. J.J.B. was noted to respond well to criticism and staff in authority, and Joyce did not allege any significant behavior or social/emotional concerns to school officials and stated J.J.B. got along well with family members. The ALJ cited to substantial evidence and connected the dots between that evidence and his conclusion.

The ALJ determined J.J.B. had "no" limitation in the ability to care for herself because: she and Joyce reported at medical appointments after she was started on a medication for sleep issues that J.J.B. was doing much better and her sleep symptoms had markedly improved; Joyce did not allege difficulty performing

16

personal care to any school or medical provider; school records did not corroborate J.J.B.'s alleged meltdowns and mood swings; school records showed she adjusted to changes in routine with ease; and her teacher noted no difficulties in this domain. The ALJ therefore determined that J.J.B. and Joyce's allegations of significant difficulties in this domain were not corroborated in medical or school records. The ALJ also decided to give more weight to Joyce's statements made to J.J.B.'s doctor, rather than her statements made at the hearing and to school officials about J.J.B.'s continued problems with sleep, because the comments made to the doctor were for purposes of treatment. Joyce highlights certain portions of the hearing when she and J.J.B. testified to the latter's limitations such as J.J.B.'s inability to tie her own shoes, her need for assistance to help with clothes, her need for assistance to bathe properly, and the delicate balance of J.J.B.'s medications. The ALJ's explanation for his "no" limitation finding confronted that very testimony with citations to the record evidence that undermined the extent of limitation alleged. The record evidence the ALJ relied upon was relevant evidence a reasonable mind might accept as adequate to support his conclusion that J.J.B. and Joyce's statements of limitation in this domain were uncorroborated. *See Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012) (stating that "if reasonable minds can differ over whether the applicant is disabled, [the court] must uphold the decision under review"). Also, as the Commissioner argues, the ALJ was simply not required to accept J.J.B. or Joyce's subjective statements.

Lastly, the ALJ found J.J.B. had "less than marked" limitation in the sixth domain of health and physical well-being. Joyce argues that the ALJ failed to consider how J.J.B.'s health problems caused such severe symptoms that she was unable to attend school due to physical fatigue, and her doctor and teacher noted she was irritable and tired. The ALJ acknowledged J.J.B.'s diagnoses of insomnia, asthma, and obesity. The ALJ considered the longitudinal record as to J.J.B.'s

asthma, pointing out that she was never noted to be in any respiratory distress or to require admission to the hospital, was able to participate in PE at school, and had only infrequent emergency room and doctor visits with reports of congestion/cough. As for J.J.B.'s obesity, the ALJ considered that the record showed J.J.B. was at the lower end of the obese range, and treatment records did not reflect any resulting limitation in her function. As for J.J.B.'s insomnia, the ALJ relied upon longitudinal treatment records which showed that after J.J.B. started Clonidine to treat her sleep issues, she consistently reported she was doing much better. A December 2016 medical record provided that her sleep symptoms had "markedly improved," and a November 2017 medical record provided that she was "doing very well" on Clonidine. AR 477, AR 654. Joyce points to records in which J.J.B. was noted to be irritable and tired, but the cited records pre-date her use of Clonidine to treat her insomnia.

Moreover, the ALJ discussed both the records indicating J.J.B.'s irritability and fatigue and the records indicating improvement of those symptoms. While Joyce relies, in part, upon the 2017-18 school attendance record which indicated J.J.B. had 16.5 absences and 27 tardies in the first three quarters of the school year, the ALJ found it significant that a treatment record provided J.J.B. was much more alert and awake and felt more attentive at school. Earlier in his Decision, the ALJ made clear he gave less weight to Joyce's hearing testimony and statements to school officials that J.J.B.'s sleep problems continued to pose problems. The ALJ's finding of "less than marked" limitation in this domain is further supported by the State Agency doctors' evaluations of "less than marked" limitation in health and physical wellbeing, one of which was done before J.J.B. began taking Clonidine.

Ultimately, the ALJ's findings in the five challenged domains are supported by "more than a mere scintilla" of evidence. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("[W]hatever the meaning of 'substantial' in other contexts, the

threshold for such evidentiary sufficiency is not high") (internal citation omitted). Remand is not warranted in this case.

## V

For the foregoing reasons, the Plaintiff's Motion for Summary Judgment (Doc. 10) is DENIED and the Defendant's Motion for Summary Affirmance (Doc. 16) is GRANTED. The Clerk of Court is directed to enter judgment as follows: "IT IS ORDERED AND ADJUDGED that the decision of the Defendant, Andrew Saul, Commissioner of Social Security, denying benefits to the Plaintiff, Joyce Bogguess, o/b/o J.J.B., is AFFIRMED." This matter is now terminated.

*It is so ordered.*

Entered on January 13, 2021.

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE